# LOAN AGREEMENT

**by and between**

**CROSBY DREDGING, LLC,**

**as Borrower,**

**CROSBY ENTERPRISES, L.L.C.**

**As Guarantor,**

**and**
**REGIONS  COMMERCIAL EQUIPMENT FINANCE, LLC**
**as Lender**

May 28, 2021

**Exhibit A**

# LOAN AGREEMENT

**THIS LOAN AGREEMENT** made and entered into this 28th day of May, 2021, is by and among CROSBY DREDGING, LLC, a Louisiana limited liability company (Louisiana Org. No. 41679776K) (sometimes hereinafter "Dredging" and any future Borrower that is party to this Agreement, collectively, "Borrowers", each, a "Borrower"), CROSBY ENTERPRISES, L.L.C., a Louisiana limited liability company (La. Org. 34691765K), as guarantor ("Enterprises") and REGIONS COMMERCIAL EQUIPMENT FINANCE, LLC (together with its successors and assigns "Lender").

**WHEREAS,** Dredging or one or more other Borrowers owns one or more of the Vessels; and

**WHEREAS,** each Borrower may request that Lender make one or more loans directly to Borrower, to be used by the Borrower solely for the purpose of refinancing existing indebtedness of one or more Borrowers; and

**WHEREAS,** Lender will consider each request for a loan from Borrower, and if it elects to approve the potential funding of such loan, will disburse the proceeds of such loan pursuant to this Agreement upon fulfillment of the conditions herein and subject to the terms and conditions hereinafter set forth. Each existing and future Loan will be governed by this Agreement and evidenced by a separate promissory note delivered by the applicable Borrower in connection with such Loan to the Borrower. Any such loan to a Borrower will be fully guaranteed by Enterprises.

**NOW, THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt of which is hereby acknowledged, Borrowers and Lender hereby agree as follows:

## ARTICLE I
### Definitions

**Section 1.01.  Definitions.**  For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

**(a)**     The terms defined in this Article shall have the meanings assigned to such terms in this Article, and include the plural as well as the singular; and

**(b)**     All accounting terms not otherwise defined herein shall have the meanings assigned to them in accordance with GAAP (as defined below).

**"Advance"** means, individually for each Loan, each advance made by the Lender to the applicable Borrower in connection with the Loan. "Advances" shall collectively refer to all Advances.

**"Affiliate"** means any Person (1) which directly or indirectly controls, or is controlled

by, or is under common control with a Person or a Subsidiary of a Person; (2) which directly or indirectly beneficially owns or holds twenty five percent (25%) or more of any class of voting stock of a Person or any Subsidiary of a Person; or (3) twenty five percent (25%) or more of the voting stock of which is directly or indirectly beneficially owned or held by a Person or a Subsidiary of a Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Aggregate Limit**" means $25,000,000.00.

"**Agreement**" means this Loan Agreement (including all exhibits and other attachments hereto), as amended, supplemented and modified from time to time in accordance with the terms hereof.

"**Applicable Law**" means the internal laws of the State of Louisiana, without regard to the conflict of laws principles of such state (or any other jurisdiction whose laws are mandatorily applicable notwithstanding the parties' choice of Louisiana law) or the laws of the United States of America, whichever laws allow the greater interest, as such laws now exist or may be changed or amended or come into effect in the future.

"**Attorneys' Fees**" shall include any and all reasonable and documented attorneys' fees incurred by Lender (whether by its use of in-house counsel or otherwise, and whether on the basis of a flat fee, retainer, contingent fee or hourly charges) incident to, arising out of or in any way connected with the preparation, negotiation, and execution of this Agreement and the other Loan Documents (and any and all amendments, modifications, renewals, extensions, and supplements thereof and thereto) or with Lender's enforcement of its rights and interests under this Agreement or any other Loan Document, including reasonable and documented attorneys' fees incurred by Lender to collect sums due, during any work-out, with respect to settlement negotiations, or in any bankruptcy proceeding (including attorneys' fees incurred in connection with any motion for relief from the automatic stay).

"**Authorized Officer**" means, as applied to a Borrower, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, vice president, chief financial officer or treasurer, in each case, whose signatures and incumbency have been certified to Lender.

"**Borrowers**" means Dredging and any future Affiliate of Enterprise that may become a party to this Agreement with the consent of Lender; each such Person, a "Borrower."

"**Business Day**" means any day other than a Saturday, Sunday or public holiday or the equivalent for banks in New Orleans, Louisiana.

"**Closing Date**" means the date of this Agreement.

"**Collateral**" means, collectively, the Vessels, all of any Borrower's property that is encumbered by a Ship or Fleet Mortgage from time to time during the term of this

Agreement, all other collateral securing the Loans, and all substitutions and replacements therefor, including all component parts and appurtenances.

**"Daily Simple SOFR"** is an independent index, which is the rate per annum equal to the secured overnight financing rate published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) (the "Administrator") on the Administrator's website on the fifth (5 ) prior SIFMA Business Day, with the conventions for this rate being established by Regions in accordance with the conventions selected or recommended by the Administrator for determining "Daily Simple SOFR" for business loans; provided, that if Regions decides that any such convention is not administratively feasible for Regions, then Regions may establish another convention in its sole discretion.

**"Dollars"** and the sign "$"mean lawful money of the United States of America.

**"Dredging"** shall mean Crosby Dredging and its consolidated subsidiaries.

**"EBITDA"** means, for each period, earnings before interest expenses, taxes, depreciation and amortization.

**"Enterprises"** means Crosby Enterprises, LLC, a Louisiana limited liability company.

**"Existing Members"** means the existing members of Enterprises on the date of this Agreement, as well as any descendant of any such member, or trust for the benefit of such descendant where the existing member is a controlling trustee.

**"Environmental Laws"** means any and all applicable federal, state, and local laws, regulations, and requirements pertaining to health, safety, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 *et seq.*, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 *et seq.*, the Occupational Safety and Health Act, 29 U.S.C. §651 *et seq.*, the Clean Air Act, 42 U.S.C. §7401 *et seq.*, the Federal Water Pollution Control Act, 33 U.S.C. §1251 *et seq.*, the Oil Pollution Act of 1990, 33 U.S.C. §2701 *et seq.*, the Hazardous Materials Transportation Safety and Security Reauthorization Act of 2005, 49 U.S.C. §5101 *et seq.*, the Toxic Substances Control Act, 15 U.S.C. §2601 *et seq.*, and all similar laws, regulations, and requirements of any governmental authority or agency having jurisdiction over Borrower or any of its properties or assets, as such laws, regulations, and requirements may be amended or supplemented from time to time.

**"Event of Default"** has the meaning set forth in Section 7.01 hereof.

**"Final Funding Date"** means June 30, 2021.

**"Financial Statements"** shall have the meaning ascribed to such term in Section 5.01(a)(1) hereof.

**"Fixed Charge Coverage Ratio"** means, for each applicable period, a ratio whose numerator is EBITDA for the period and whose denominator is scheduled payments of principal and interest during such period, exclusive of balloon payments of principal.

**"Funding Date"** means, for each Loan, the date on which such Loan is or was fully funded.

**"GAAP"** means generally accepted accounting principles as in effect in the United States of America.

**"Hedge Agreement"** means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, currency swap transactions, cross-currency rate swap transactions, currency options, cap transactions, floor transactions, collar transactions, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options or warrants to enter into any of the foregoing), whether or not any such transaction is governed by, or otherwise subject to, any master agreement or any netting agreement, and (b) any and all transactions or arrangements of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement (or similar documentation) published from time to time by the International Swaps and Derivatives Association, Inc. or any other master agreement (any such agreement or documentation, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

**"Hedge Obligations"** means all obligations of Borrower owed or owing to Regions Bank (or any of its affiliates) under any Hedge Agreement, whether now existing or hereafter arising.

**"Indebtedness"** means all items of indebtedness which, in accordance with GAAP, would be deemed a liability of a Person as of the date such indebtedness is to be determined, and shall also include all indebtedness and liabilities of others assumed or guaranteed by such Person or in respect of which such Person is secondarily or contingently liable, whether by reason of any agreement to acquire such indebtedness, to supply or advance sums, or otherwise. Without limiting the scope of the foregoing, such term shall include (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations to pay the deferred purchase price of property or services, except trade accounts payable arising in the ordinary course of business, (d) all lease obligations which are required to be capitalized for financial reporting purposes in accordance with GAAP, (e) all debts secured by any mortgage, lien, pledge, attachment, charge, or other security interest or encumbrance of any kind in respect of any property or upon the income or profits therefrom, whether or not such debt is assumed by the party granting such security, and (f) all debt of third persons guaranteed by a party.

20994.0004RPT8628

**Individual Loan Limit**.  The words "Individual Loan Limit" mean, with respect to each Loan made with respect to a Vessel (or if a Loan is made with respect to more than one Vessel, such Vessels in the aggregate) 90% of the orderly liquidation value of the Vessel as determine in a marine survey and appraisal in form and substance acceptable to Lender,. Provided, for the initial Vessels and the initial Loan with respect thereto, the limit will be 84.2% of fair market value of the Vessels.

**"Interest Rate"** means, for each Loan and Note, respectively, a variable rate of interest in the amount provided in the Note.

**"Lender"** means Regions Commercial Equipment Finance, LLC together with its successors and assigns.  In the event of the assignment of any Note, references to "Lender" as they may relate to a specific Borrower, Note, or Ship Mortgage securing such Note shall be solely to the holder of the assigned Note.

**"Lender Business Day"** means any day that is not (i) a Saturday, (ii) a Sunday, or (iii) another day that is a legal holiday under the laws of the State of Alabama and is a day on which Lender is closed.

**"Lien"** means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangements, encumbrance, lien (statutory or other), or preference, priority, or other security agreement or preferential arrangement, charge, or encumbrance of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement), any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement, mortgage lien or similar document under the Uniform Commercial Code or the Ship Mortgage Act (46 U.S.C. §31301 et seq.) or any comparable law of any jurisdiction to evidence any of the foregoing.

**"Loan"** means a loan made to a Borrower pursuant to Section 2.01 of this Agreement in connection with one or more Vessel(s).

**"Loans"** collectively refers to each and every Loan now or hereafter funded under this Agreement with respect to the Vessels.

**"Loan Documents"** means this Agreement, the Note(s), the Security Documents and all related documents, agreements, consents, schedules and attachments in connection with the Loan.  All Loan Documents in favor of Lender must be in a form in compliance with this Agreement and otherwise acceptable to Lender in all respects. Loan Documents do not include Hedge Agreements.

**"Material Adverse Change"** means, with respect to any Person, a material adverse change in the business, operations, results of operations, assets, liabilities or condition (financial or otherwise) of such Person taken as a whole.

**"Material Adverse Effect"** means, with respect to any Person, a material adverse effect on the business, operations, results of operations, assets, liabilities or condition (financial or otherwise) of such Person taken as a whole.

**"Maturity Date"** means, for each Loan and Note, a term of sixty months. The Maturity Date for each Note will be expressly set forth in each Note. If the applicable Borrower and Lender mutually agree, such term may include a stub or short month, commencing on the Funding Date and ending on the last day of the month in which the Funding Date occurs, in which case the set month period shall commence at the conclusion of such short month.

**"Note"** means, with respect to each Loan, the Promissory Note evidencing the Loan, in each case made payable to the order of the Lender, in the principal amount of the applicable Loan, together with any amendments thereto, and renewals, replacements, refinancings and consolidations therefor; collectively, the "Notes."

**"NVDC"** means the National Vessel Documentation Center or any successor office or officer fulfilling the role of registering ships and recording ship mortgages in the United States.

**"Obligations"** means, all indebtedness, obligations and liabilities of Borrower(s) under the Note(s) or the other Loan Documents, as well as all Hedge Obligations, whether on account of principal, interest, indemnities, fees (including, without limitation, attorneys' fees, remarketing fees, origination fees, collection fees and all other professionals' fees), costs, expenses, taxes or otherwise.

**"Permitted Liens"** means the Liens on the Collateral permitted under Section 6.04 hereof.

**"Person"** means any individual, partnership, joint venture, association, joint stock company, trust, unincorporated organization, corporation, entity or any government or any agency or political subdivision thereof.

**"Relevant Governmental Body"** means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

**"Security Documents"** means the Ship Mortgage(s) and all other documents now or hereafter constituting security for the Loans.

**"Ship Mortgage"** shall mean, with respect to each Vessel, that certain Preferred Ship or Preferred Fleet Mortgage executed or to be executed by or on behalf of the applicable Borrower in favor of the Lender encumbering such Vessel, recorded or to be recorded in the office of the NVDC, as amended, supplemented and modified from time to time in accordance with the terms thereof.

**"SIFMA Business Day"** means any day that is not (i) a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**Subsidiary**" means, as to any Person, a corporation of which shares of stock having ordinary voting power (other than stock having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other manager of such corporation are at the time owned, or the management of which is otherwise controlled, directly, or indirectly, through one or more intermediaries, or both, by such Person.

"**Taxes**" shall mean any present or future taxes, levies, imposts, duties, fees, assessments, deductions, withholdings or other charges of any kind, that may now or hereafter be imposed or asserted by any jurisdiction or any political subdivision thereof or any taxing authority therein and all interest, penalties or similar liabilities with respect thereto.

"**Term SOFR**" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Vessel**" means each vessel that is approved for financing by Lender under this Loan Agreement (if more than one, collectively, the "Vessels"). A list of the Vessels, including the Vessel name, owner and official number, is attached hereto as Schedule 1. The term "Vessel" shall include, without limitation, all on board equipment, machinery and supplies for such Vessel.

## ARTICLE II
## Amount, Terms and Repayment of the Loan

**Section 2.01. (a) Loans.** Lender agrees with Dredging and each other Borrower that in connection with a Borrower's refinancing of existing indebtedness of Borrower and an identified Vessel (or Vessels), if such Borrower requests financing by Lender of such Loan, and Lender approves the making of such Loan with respect to such Vessel(s) and is satisfied in its sole discretion that all conditions to the making of such Loan are satisfied, Lender will make a term loan to the Borrower with respect to the Vessel(s), on the terms and subject to the conditions set forth herein, in the Loan Documents and the Security Documents, in an amount not to exceed approved advance to the Vessel (such Loans, collectively, the "Loans"). The Loan made with respect to one more Vessel shall not exceed the Individual Loan Limit. The total of the outstanding Loans in the aggregate shall not exceed the Aggregate Limit. Each Loan with respect to a Vessel or a group of Vessels collectively shall be funded in a single funding, to such Person(s) as may be specified in the funding instructions provided in Section 2.02. Each Loan shall be disbursed to the applicable Borrower in accordance with the following provisions of this Article II. Each Loan request shall specify the amount requested to be borrowed, the requested term, and the Vessel(s) that will be subject to the Ship Mortgage securing such Loan.

**Section 2.01. (b) Term of Loans.** Each Loan shall have a term of sixty months, commencing on the Funding Date for such Loan. The term of each Loan will be determined by the applicable Borrower and Lender in their discretion. The term selected by the applicable Borrower and Lender will be reflected in the provisions of the applicable Note.

**Section 2.01 (c)    Interest Rate on Loans.  The interest rate on each Loan (the "Interest Rate") hereunder is subject to change from time to time as provided in this Section. Interest rate changes on the Loan will not occur more often than each Lender Business Day and will be based on changes in Daily Simple SOFR (the "Index"). The interest rate per annum on the Loan will be equal to the Index plus two and eighty-six one hundredths of one percentage points (2.86%) (the "Margin"). The interest rate on the Loan may change daily based on changes in the most recent Index reasonably available to the Bank. The Index will not be less than 0.0 percent 0.0%) per annum. The interest rate on the Loan will not be less than two and eighty-six one hundredths of one percentage points (2.86%) per annum. Regions will tell Borrower the current Index upon Borrower's request. The Index is not necessarily the lowest rate charged by Regions on its loans. Borrower understands that Regions may make loans based on other rates as well.**

**Section 2.02.  Disbursement of Proceeds.**  Disbursement of Loan Proceeds under a Loan will be in accordance with the written disbursement instructions of the applicable Borrower and the existing mortgagee of the Vessel(s) that is (are) the subject of the Loan.  Notwithstanding any provision of this Agreement to the contrary, no Borrower shall be entitled to request any Advance under a Loan after the Final Funding Date, unless the Lender agrees in writing to extend such Loan in its sole and absolute discretion.

**Section 2.03.  The Notes; Payment Terms.**  A Borrower's obligation to repay its Loan shall be evidenced by and repayable with interest in accordance with the terms of the applicable Note. Borrower's obligations to repay the Loan(s) shall be evidenced by and repayable with interest in accordance with the terms of a promissory note in substantially the form attached hereto as **Schedule 2.03.**  Except as may otherwise be provided in the Note executed by Borrower and accepted by the Lender, such as a stub or short payment month, under each Note, Borrower will make equal and fully amortizing monthly payments of principal and interest, in arrears, on each Loan, with a final payment in the amount of all outstanding principal, interest and other amounts due thereunder.

**Section 2.04    Method of Payment.**  All payments of principal, interest, premiums and other amounts to be made by any Borrower under this Agreement, the Note(s), and the other Loan Documents shall be made by wire or ACH transfer as provided in the Note (or by such other method or at such other address as Lender may specify to Borrower(s) in writing), without setoff, deduction, or counterclaim, in Dollars and in immediately available funds.  Payments will be applied, first, to outstanding fees, costs and expenses due from Borrower, second, to accrued and unpaid interest, with the remaining balance to principal.  Whenever any payment under this Agreement, the Notes, or any other Loan Document shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of interest.

**Section 2.05    Computation of Interest**.  Interest on the indebtedness of each Borrower under the Loans and evidenced by the Notes shall be computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the actual number of days the principal balance is outstanding.

**Section 2.06   Late Fees.**  If any sum payable under a Note shall not be received by the holder of the Note within ten days of when due, the applicable Borrower shall pay to the Lender that is the holder of such Note a late charge equal to five percent (5.0%) of such overdue amount (subject to any applicable provisions in the Note).  Lender shall also have the right to charge default interest under each Note following an Event of Default, at a default rate equal to five percent (5%) above the stated fixed Interest Rate under the Note, as more fully provided in the Note.  However, in no event shall Lender receive or be entitled to receive an amount in excess of the maximum amount permitted by law.  Each Borrower agrees that the amount of such late charge represents a reasonable estimate of the cost to Lender of processing a delinquent payment and that the acceptance of any late charge shall not constitute a waiver of default with respect to the overdue amount or prevent Lender from exercising any other available rights and remedies.

**Section 2.07.   Prepayment.**   Prepayment of any Loan is subject to the following limitations.  Prepayments on any Loan and Note may not be made prior to the first anniversary date of the applicable Loan and Note.  Prepayments may be made in whole, and not in part, on a regularly scheduled installment date following the first anniversary date of the Note evidencing the Loan, upon giving at least thirty (30) days prior written notice of prepayment to the Lender that is the holder of the Note.

**Section 2.08.   Prepayment Resulting from Acceleration.**   If a holder of a Note shall elect as one of its remedies acceleration of payment of the balance owing under such Note pursuant to Section 7.02 hereof, the Borrower shall pay a premium determined in accordance with the computation set forth in Section 2.07, above, calculated as of the date of acceleration and based on the balance due on the Note following acceleration and the premium percentage in effect on such date.  Such fee shall be in addition to all other amounts then payable under such Note.

**Section 2.09.   Use of Proceeds of New Loan.**   The proceeds of each Loan shall be used by the Borrower under such Loan solely for the purpose of refinancing existing indebtedness of the Borrower or Borrower's affiliates, incurred costs in connection with refurbishment of the Vessel and payment of closing costs approved by Lender.

**Section 2.10.   Taxes, Assessments, etc.**  Each Borrower agrees to pay all amounts owing under its Notes, this Agreement, or the other Loan Documents free and clear of and without deduction for any present or future Taxes, and (a) that if it is prevented by operation of law from paying any Taxes, then the interest rate or fees required to be paid under the Borrower's Notes or the other Loan Documents shall be increased by the amount necessary to yield to the holder of the Note interest or fees at the rates specified in the Note, this Agreement or the other Loan Documents after provision for the payment of all such Taxes and without taking into account any tax benefits accruing to the Lender from such payment; (b) that it shall hold Lender and any holder of Borrower's Notes harmless from and against any liabilities with respect to any Taxes (whether or not properly or legally asserted); and (c) to provide Lender or such other holder of its Notes with the original or a certified copy of evidence of the payment of any Taxes by it, as the holder may reasonably request, or, if no Taxes have been paid to provide to the holder, at the holder's request, with a certificate from the appropriate taxing authority or an opinion of counsel acceptable to Lender or such other holder stating that no Taxes are payable.

**Section 2.11.   Term.**   This Agreement shall remain in effect so long as any sums are owing or any duties or obligations remain to be performed by any Borrower to or for the benefit of the

holder of any Note under the Loan Documents, the Security Documents or any documents or agreements relating hereto or thereto.

**Section 2.12.  Currency of Payments.**  All payments required to be made hereunder, or any of the Loan Documents, shall be payable solely and exclusively in United States dollars.

**Section 2.13.  Hedge Agreements.**.  Each Borrower shall enter into a Hedge Agreement with Lender or an affiliate of Lender or such other financial institution counterparty reasonably acceptable to Lender.  Such Hedge Agreement shall be in form and substance reasonably acceptable to Lender and for the sole purpose of hedging a notional amount of the principal amount of the Loan to limit the risk of interest rate fluctuations.

**ARTICLE III**
**Security**

**Section 3.01  Collateral.**  The payment and performance of each Loan owing to the Lender that is the holder the Loan, shall be secured by the following described property and guaranty:

    (a)    A first preferred mortgage lien and security interest (subject to any Permitted Liens) against the Vessel(s) that are the subject of such Loan and owned by such Borrower, securing each Loan held by such Lender, against all of right, title and interest of such Borrower in and to any and all present and future:  (i) salvage or requisition awards or recoveries, recoveries in general average, equipment, and machinery, whether now owned or hereafter acquired, arising out of the use or operation of, or otherwise related to, such Vessel(s); and (iii) all amounts due from underwriters under any insurance on any Vessel(s) as payment of losses, or as return premiums, or otherwise;

    (b)    All products and proceeds of any of the foregoing.

    (c)    The personal guaranty of Enterprises.

Should the originating Lender assign a Ship Mortgage, the Ship Mortgage will be amended so as to secure only the Note delivered in connection with the Vessel(s) subject to such Ship Mortgage.

Each Vessel subject to a Ship Mortgage shall remain subject to such Ship Mortgage until the Loan(s) secured by such Vessel has/have been paid in full.  Unless prepayment occurs in connection with a total loss of a Vessel, the partial payment of a Note shall not entitle a Borrower to the release of any one or more Vessel subject to such Ship Mortgage.  In the event of a total loss of a Vessel, the Vessel may be abandoned to the underwriters upon receipt of the full balance of the required insurance proceeds, as provided in the applicable Ship Mortgage.

Application of insurance proceeds following a casualty to a Vessel shall be subject to the provisions of the applicable Ship Mortgage.  Lender shall have first priority security interests in the Collateral held by Lender, and there shall be no other Liens affecting such

Collateral other than Permitted Liens. In connection with the funding of each Loan, Borrower agrees to execute and deliver to the Lender the Ship Mortgage on the Vessel(s) that is (are) the subject of the Loan, as well as any other document or agreement deemed necessary by Lender or its counsel to create or perfect a first priority preferred mortgage lien and security interest in favor of the Lender on such Vessel(s) and the other Collateral held by Lender.

**Section 3.02   Financing Statements and Additional Documents.** Each Borrower authorizes the Lender to prepare and file Uniform Commercial Code financing statements, and amendments thereto, describing the Collateral held by Lender in any appropriate jurisdiction, all without the signature of Borrower if permitted by applicable law. Borrower shall execute and cause to be executed such further documents and instruments as Lender, in its sole discretion, deems necessary or desirable to evidence and perfect its liens and security interests in the Collateral.

**ARTICLE IV**
**Conditions to Lender's Obligation to Advance**

**Section 4.01   Loan Documents; Lien Search Reports, etc.** Notwithstanding any provision contained herein or any other Loan Document to the contrary, a Borrower shall not be entitled to request any Advance with respect to a Vessel unless the Lender shall have first received the following. References to "Borrower" and "Vessel" hereunder shall be to the Borrower and the Vessel which are the subject of the requested Advance:

(a) Officer's or Manager's Certificate. A Certificate executed by the secretary, manager or other equivalent officer or representative of Borrower and Enterprises, dated as of the date of this Agreement, certifying the names of the officers, members or managers of each Borrower authorized to sign this Agreement and each of the other Loan Documents to which Borrower (and Enterprises, if applicable) is or is to be a party (including the certificates contemplated herein) together with specimen signatures of such Persons, which such Certificate shall have appended thereto copies of (i) the resolutions of the board of directors, members, managers, or shareholders of such Persons, as applicable, duly adopted and in force, authorizing the execution and delivery of this Agreement and the other Loan Documents to which any such Person is or is to be a party, as well as the performance of the obligations stated therein; (ii) the articles or certificate of incorporation or organization of each Borrower; and (iii) a copy of the by-laws or operating agreement, if any, of each Borrower, each certified by the secretary or other appropriate officer of Borrower;

(b) Governmental Certificates. Certificates of the appropriate government officials of the state of incorporation or organization of each Borrower as to the existence and good standing of Borrower, each dated within ten (10) Business Days prior to the date hereof;

(c) Note. The Note evidencing Borrower's indebtedness with respect to such Advance, duly executed by such Borrower;

(d) Ship Mortgage. A first preferred Ship Mortgage duly executed by Borrower with respect to the Vessel that is the subject of the Advance (which Ship Mortgage shall provide the Lender a

11

first priority preferred mortgage lien and security interest against the Vessel and related Collateral encumbered thereby, subject only to Permitted Liens);

(e)  Satisfactory Lien Searches.  Search results of UCC filings, vessel abstracts, judgment liens, tax liens and pending litigation with respect to Borrower, in form and substance satisfactory to the Lender, which show that Lender has, or will have, at the time of the Advance, a valid and subsisting first priority preferred mortgage lien and/or security interest in all of the Collateral and that there are no other Liens that may affect the Collateral other than Permitted Liens;

(f)  Documentation.  Copies of the current certificate of documentation for the Vessel, as well as any required Certificate of Inspection, which shall be current and in full force and effect, without any material notations of any material violation or deficiency;

(g)  Proof of Insurance.  A certificate of insurance or cover note evidencing the placement of all insurance policies required by Section 5.15 of this Agreement and the Ship Mortgages, together with loss payable and other required endorsements in favor of the Lender;

(h)  Payout Letters.    Written payout letters from any existing mortgagee of the Vessel, reflecting the agreement of such mortgagee to fully release its mortgage on the Vessel upon its timely receipt of the amount specified in such letter.

(i)  Other Documents.  Such other agreements, documents, instruments and certificates as the Lender may reasonably request, executed by Borrower, if applicable, including, without limitation, any documents necessary to provide the information referenced in Section 8.15 hereof.

**Section 4.02   Additional Conditions to Lender's Obligation to Advance.**  The making of any Advance by Lender under this Agreement is subject to the following additional conditions precedent:

(a)  Completion of Due Diligence.  The Lender shall have completed all financial and legal analysis and other due diligence with respect to each Borrower, and Lender shall have completed an inspection of the Collateral, in such scope as determined by, and with results reasonably satisfactory in substance to, Lender;

(b)  Compliance with Representations and Warranties.  All of the representations and warranties of each Borrower set forth herein are true and correct on and as of the date of the Advance;

(c)  Compliance with Covenants.  Each Borrower is in compliance with all of the affirmative and negative covenants provided in this Agreement on and as of the date of the Advance;

(d)  Material Adverse Change.  As reasonably determined by Lender, there shall have occurred no material adverse change in the business, condition (financial or otherwise), operations, prospects, or properties of any Borrower from the financial condition reflected on the financial statements submitted to Lender prior to credit approval;

(e) No Default. There shall be no uncured default of any Borrower, and there shall have occurred no event that, with the passage of time or the giving of notice, or both, and the failure of Borrower to cure, would constitute a default, under the Loan Documents; and

## ARTICLE V
## Affirmative Covenants

Each Borrower and Enterprises agrees as follows. So long as any Note shall remain unpaid or a Borrower shall have any unfulfilled or undischarged obligations or duties under the Loan Documents, the Security Documents or any related agreements, Borrower and Enterprises will comply with the following requirements. References in this Article V to a Note, the Collateral or a Vessel shall be to the applicable Borrower's Note(s), Collateral and Vessel(s).

**Section 5.01. Financial Statements; Other Information.** Enterprises will deliver to Lender, or cause to be delivered to Lender:

**(a)      Financial and Other Data.** During the term of this Agreement, Enterprises and Dredging shall, respectively (i) maintain books and records in accordance with generally accepted accounting principles consistently applied ("**GAAP**") and prudent business practice; (ii) promptly provide Lender, within one hundred twenty (120) days after the close of each fiscal year, a copy of Enterprises' audited annual consolidated financial statement and a copy of Dredging's annual audited consolidated financial statement, prepared by independent certified public accountants reasonably acceptable to Lender, and within forty-five (45) days of the end of each fiscal quarter, a copy of Enterprises' and of Dredging's internally prepared quarterly consolidated financial statement, in each case certified by the chief financial officer of Enterprises and of Dredging, and (iii) furnish Lender all other financial information and reports and such other information as Lender may reasonably request concerning a Borrower and its affairs, or the Collateral or its condition, location, use or operation.

Enterprises represents and warrants that all information and financial statements at any time furnished by or on behalf of any Borrower are accurate and reasonably reflect as of their respective dates, results of operations and the financial condition of Enterprises and such other consolidated entity they purport to cover. Credit and other information regarding any Borrower or its Affiliates, any Note or the Vessel(s) may be disclosed by Lender to its Affiliates, agents and potential assignees.

**(b)** promptly following the completion of reasonable period for Borrower's investigation and examination of such matter, notice to Lender in writing of all litigation and of all proceedings before any state or federal court or any governmental or regulatory agency, bureau or commission affecting Borrower of the type described in Section 5.15 hereof or which seek a monetary recovery against Borrower which if not covered by insurance could have a Material Adverse Effect on the financial condition Borrower or Enterprises, along with, if requested in writing by Lender, an opinion of Borrower's counsel regarding the circumstances underlying and perceived merit of such litigation or proceedings;

**(c)** as promptly as practicable (but in any event not later than five (5) Business Days) after Borrower obtains knowledge of the occurrence of any event which constitutes an Event of

Default (as hereinafter defined) or would constitute an Event of Default with the passage of time or the giving of notice or both, notice to Lender of such occurrence, together with a detailed statement by an officer of Borrower of the steps being taken by Borrower to cure such Event of Default or monitor such event that is not an Event of Default; and

(d)    from time to time and promptly upon the request of Lender, such data, certificates, reports, statements, documents or further information or assurances regarding (i) the Loan Documents or the Security Documents to which Borrower or Enterprises is a party, or (ii) the business, assets, liabilities, financial condition, results of operations or business prospects of the Borrower or Enterprises as Lender may reasonably request, in each case in form and substance, and certified in a manner, satisfactory to Lender.

(e)    quarterly, at the time of the delivery of the quarterly financial statements of Enterprises and Dredging, a certificate of compliance from each of Enterprises and Dredging, certified by each company's CFO, verifying such Person's compliance with the financial covenant and other terms and provisions of this Agreement and the other Loan Documents. A form of Certificate of Compliance is attached hereto.

**Section 5.02.    Compliance with Laws and Regulations; Payment of Taxes and Claims.** Borrower, in the conduct of its business, will comply with all applicable laws, rules, regulations and orders (such compliance to include, without limitation, paying and discharging promptly, and in all events before the same become delinquent, all taxes, claims, assessments and governmental charges imposed upon it or upon its property, except to the extent contested in good faith), and shall comply with and perform and observe all material covenants, provisions and conditions to be performed and observed on the part of Borrower in connection with all other loan or credit agreements.

**Section 5.03.    Insurance.**  Borrower shall obtain and maintain insurance on the Vessels owned by it in accordance with the requirements of the Security Documents.  A list of the required coverages, and the amounts of required coverage, are contained in Schedule 5.03.  Borrower shall promptly provide Lender with evidence of such insurance coverage.   Additionally, Borrower shall provide not less than thirty (30) days advance written notification to Lender in the event of cancellation or material change in the terms of such coverage.

**Section 5.04.    Preservation of Legal Existence.** Borrower shall preserve and maintain its legal existence; provided, however, that Borrower will in all instances obtain Lender's consent to any change in the status of its corporate existence (whether by merger, dissolution or otherwise),

**Section 5.05.    Inspection.**   At any reasonable time and from time to time, upon prior notice to Borrower, Lender or any other agents or representatives of Lender shall be allowed to examine and make and prepare copies of and abstracts from the records and books of account of, and visit and inspect the Collateral and the other properties of, Borrower and to discuss the affairs, finances and accounts of Borrower with any officer of Borrower.

**Section 5.06.    Maintenance of Properties, Etc.**   Borrower shall maintain and preserve the Collateral and all of its other properties necessary or useful in the proper conduct of its current business in good mechanical condition and running order, ordinary wear and tear excepted.

**Section 5.07.  Maintenance of Records and Books of Account.**  Enterprises shall keep accurate records and books of its accounts, in accordance with GAAP consistently applied.

**Section 5.08.  Discharge of Indebtedness.**  Borrower shall promptly pay and discharge any and all Indebtedness and lawful claims which, if unpaid, might become a lien or charge upon the Collateral, except such as may in good faith be contested or disputed or for which arrangements for deferred payment have been made, provided appropriate reserves are maintained, to the satisfaction of Lender, for the eventual payment thereof.

**Section 5.09.  Uninsured Loss.**  Borrower shall give Lender written notice of any uninsured loss suffered by Borrower through fire, theft, liability or property damage if such loss would have a Material Adverse Effect on the financial condition of Borrower.

**Section 5.10.  Operation of the Vessels.**  The Vessels and all related equipment shall at all times be operated and maintained in accordance with good industry practice within the territorial or jurisdictional waters of the United States.

**Section 5.11  Taxes.**  Borrower and Enterprises has filed all tax returns (federal, state, and local) required to be filed, including all income, franchise, employment, property, and sales taxes, and have paid all of its respective liabilities for taxes, assessments, governmental charges, and other levies that are due and payable, and Borrower knows of no pending investigation of Borrower by any authority or of no pending but unassessed tax liability.

**Section 5.12  Disclosure.**  No statement, information, report, representation, or warranty made by Borrower or Enterprises in this Agreement or in any other Loan Document or furnished to Lender in connection with this Agreement or any of the transactions contemplated hereby contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading.  There is no matter known to Borrower or Enterprises which has a material adverse effect, or which might in the future have a material adverse effect, on the business, condition (financial or otherwise), operations, prospects, or properties of Borrower or Enterprises that has not been disclosed in writing to Lender.

**Section 5.13  Agreements.**  Neither Borrower nor Enterprises is a party to any indenture, loan, or credit agreement, or to any lease or other agreement or instrument, or subject to any charter or other organizational restriction which could have a material adverse effect on the business, condition (financial or otherwise), operations, prospects, or properties of Borrower or Enterprises, or the ability of Borrower or Enterprises to pay and perform its obligations under the Loan Documents.  Neither Borrower nor Enterprises is in default in any respect in the performance, observance, or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument material to its business.

**Section 5.14  Environmental Matters.**

Borrower and its Affiliates, and all of their respective properties, assets, and operations, are in material compliance with all Environmental Laws.  Borrower is not aware of, nor has Borrower received notice of, any past, present, or future conditions, events, activities, practices, or incidents which may interfere with or prevent the material compliance or continued material compliance of Borrower or its Affiliates with any Environmental Laws.

20994.0004RPT8628

Borrower and its Affiliates have obtained all permits, licenses, and authorizations which are required under Environmental Laws.

There is no action, suit, proceeding, investigation, or inquiry before any court, administrative agency, or other governmental authority pending or, to the knowledge of Borrower, threatened against Borrower or its Affiliates relating in any way to any Environmental Law, which, if adversely determined, would have a material adverse effect on Borrower.

Borrower (i) has no liability for remedial action under any Environmental Law, (ii) has received no request for information by any governmental authority with respect to the condition, use, or operation of any of its properties or assets, and (iii) has received no notice from any governmental authority or other Person with respect to any violation of or liability under any Environmental Law. No Lien arising under any Environmental Law has attached to any of the properties or assets of Borrower.

**Section 5.15    Litigation and Judgments.**  Except as disclosed by Borrowers on Schedule 5.15, there is no action, suit, investigation, or proceeding before or by any court, governmental authority or arbitrator pending, or to the knowledge of Borrower, threatened against or affecting any Borrower or Enterprises, that would, if adversely determined, is reasonable expected to have a material adverse effect on the business, condition (financial or otherwise), operations, prospects, or properties of a Borrower or Enterprises, or the ability of any Borrower or Enterprises to pay and perform the Obligations.  There are no outstanding judgments against any Borrower or Enterprises.

**Section 5.16    Citizenship.**  Borrower is a citizen of the United States eligible to operate vessels in the coastwise trade within the meaning of Section 2 of the Shipping Act of 1916 (46 U. S. Code §50501).  Borrower is not a "national" of any foreign country or of any "enemy country" as either is defined in any statute or executive order of the United States, or of any regulations, rules, interpretations or rulings issued thereunder, and Borrower is not acting on behalf of, or for the benefit of, any foreign country which, or for which, actions on behalf of is prohibited by any statute of the United States or any regulations or rulings issued thereunder.

**ARTICLE VI**
**Negative Covenants; Financial Covenant**

Each Borrower and Enterprises agrees as follows. So long as any Note shall remain unpaid or Borrower shall have any unfulfilled or undischarged obligations or duties under the Loan Documents, the Security Documents or any related agreements, Borrower, Dredging and Enterprises, as applicable, will comply with the following requirements.  References in this Article V to a Note or Vessel shall be to the Borrower's Note(s) or Vessel(s).

**Section 6.01.    Sale of Collateral.**  Borrower will not sell, lease, assign, transfer or otherwise dispose of the Vessels included in the Collateral, unless such disposition is permitted in the Security Documents.  The foregoing shall not restrict the chartering of any Vessel in the ordinary course of Borrower's business.

**Section 6.02.  Consolidation and Merger; Ownership of Borrower and Enterprises.**  Neither Borrower nor Enterprises will not (a) enter into any merger or consolidation with, or sell or transfer all, substantially all or any substantial portion of its assets to, any other Person, without the prior written consent of Lender, (b) dissolve, liquidate or cease or suspend the conduct of business, or cease to maintain its existence, or (c) enter into or suffer any transaction or series of transactions as a result of which Borrower is directly or indirectly controlled by Persons who are not Affiliates of Borrower as of the date of this Agreement, or in which the Existing Members of Enterprises do not hold directly or indirectly at least 90% of the membership interests of Borrower.

**Section 6.03.  Restrictions on Nature of Business.**  The Borrower will not engage in any line of business materially different from that presently engaged in by the Borrower, without written permission of Lender, not to be unreasonably withheld.

**Section 6.04.  Liens and Encumbrances.**  Borrower will not permit or suffer to exist or to be created any Lien upon the Collateral, except:

such Lien as may be granted to Lender;

Liens for taxes, assessments, or other governmental charges not yet due or which are being contested in good faith by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor;

Liens of lessors (subordinated), carriers, warehousemen, mechanics, laborers and materialmen, and shipyards repairing or modifying a Vessel arising by law in the ordinary course of business or in connection with repairs to or modifications of a Vessel for sums either not yet due or being contested in good faith by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor; and

With respect to the Vessels, Liens in an aggregate amount for all Vessels not to exceed $250,000.00: (i) for crew's wages (1) for thirty (30) days after the termination of a voyage, or (2) which shall then be contested in good faith by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor, (ii) for general average (1) which are unclaimed, (2) for thirty (30) days after having been claimed, or (3) which shall then be contested in good faith by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor, (iii) for salvage, whether voluntary or contract, (1) which are unclaimed, (2) for thirty (30) days after having been claimed, or (3) which shall then be contested in good faith by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor, (iv) for the wages of a stevedore when employed directly by Borrower, or the operator, master or agent of a Vessel, (v) for repairs or with respect to any changes made in a Vessel (1) which are unclaimed, (2) for thirty (30) days after having been claimed, or (3) which shall then be contested in good faith by appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor, and (vi) for necessaries (1) which are unclaimed, (2) for thirty (30) days after having been claimed, or (3) which shall then be contested in good faith by

20994.0004RPT8628

appropriate action promptly initiated and diligently conducted, if such reserve as shall be required by GAAP shall have been made therefor.

**Section 6.05. Vessel Operations.** Borrower will not operate any Vessel, or permit any Vessel to be operated, in (a) any area excluded from coverage by any insurance policy or coverage in effect with respect to the Vessel or required by the terms of this Agreement or any other Loan Document, or (b) outside of the territorial waters of the United States of America.

**Section 6.06    Financial Covenant.** At all times while any Obligations of any Borrower are outstanding, Enterprises and Dredging respectively agrees to maintain (on a consolidated basis with its subsidiaries) a Fixed Charge Coverage Ratio for each fiscal quarter of at least 1.0 to 1.0. Enterprises' and Dredging's compliance with such covenant will be measured on a quarterly basis based on the most recent quarterly consolidated financial statements of Enterprises.

## ARTICLE VII
## Events of Default, Rights and Remedies

**Section 7.01. Events of Default.** "Event of Default", wherever used herein, means any one of the following events:

(a)    Failure of any Borrower to pay any installment of principal or interest scheduled under any of the Notes or other Obligations held by Lender, within five (5) days of the date such payment is due;

(b)    Should any Borrower fail to maintain in full force and effect all insurance required in this Agreement or any of the Ship Mortgage(s);

(c)    To the extent such matters are not covered by subparagraphs (a), (b), or (d) through (k) below, default in the performance or observance by any Borrower of any covenant, warranty, promise, condition, agreement or term contained in this Agreement, the Security Documents, in any commitment letter, or in any loan agreement, mortgage, security agreement, guaranty or other agreement, or amendment or supplement thereof, evidencing or securing the Obligations **(other than the Hedge Obligations, which shall be governed in accordance with their respective terms)**, or other indebtedness of any Borrower to Lender any other Lender Affiliate, or default in the performance or observance by Borrower of any covenant, warranty, promise, condition, agreement or term contained in any lease, charter, contract, instrument or other agreement between any Borrower and Lender or any Lender Affiliate, and should such default remain uncured after ten (10) days from the occurrence thereof or after the expiration of any period of grace contained in such agreement, whichever is greater;

(d)    Any representation, warranty, statement, certificate, schedule or report made herein or furnished hereunder, or in any loan agreement, note, mortgage, assignment or security agreement, charter, lease or other agreement executed or endorsed by any Borrower in favor of Lender or any Lender Affiliate, shall prove to have been false or misleading in any material respect when made, and such default is not remedied within thirty (30) days after written notice to Enterprises by Lender;

(e) Any proceeds from the sale, loss, requisition, seizure or forfeiture of, or from any insurance carried on or in respect of, the Vessels which is otherwise payable to Lender shall not have been received by Lender for distribution in accordance with the provisions hereof within ten (10) days after the same are received by the applicable Borrower;

(f) Enterprises, Dredging or any Borrower shall (i) apply for or consent to the appointment of or the taking of possession by a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) admit in writing its inability to pay, or generally not be paying, its debts as they become due, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary action under the Federal Bankruptcy Code (as now or hereafter in effect), (v) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up or composition or adjustment of debts, (vi) fail to controvert in a timely or appropriate manner or acquiesce in writing to any petition filed against the Borrower or Enterprises in an involuntary action under such Bankruptcy Code or (vii) take any action for the purpose of effecting any of the foregoing;

(g) A proceeding or case shall be commenced without the consent of a Borrower, Dredging or Enterprises in any court of competent jurisdiction seeking (i) the liquidation, reorganization, dissolution, wind-up or composition or readjustment of debts of Borrower, Dredging or Enterprises, (ii) the appointment of a receiver, trustee, custodian, liquidator or the like for a Borrower, Dredging or Enterprises or of all or a substantial part of its assets or (iii) similar relief with respect to a Borrower, Dredging or Enterprises under any law relating to bankruptcy, insolvency, reorganization, winding-up or composition or adjustment of debts; and such proceeding or case continues undismissed, or an order, judgment or decree approving or ordering any of the foregoing is entered and continues unstayed for a period of sixty (60) days, or any order for relief against the Borrower, Dredging or Enterprises is entered in any involuntary case under the Bankruptcy Code;

(h) Should Borrower or Enterprises (a) enter into any merger or consolidation with any Person that is not an Affiliate of Borrower, or merge or consolidate with any Person where Borrower is not the surviving entity, or sell or transfer all, substantially all or any substantial portion of its assets to, any Person, without the prior written consent of Lender, (b) dissolve, liquidate or cease or suspend the conduct of business, or cease to maintain its existence, (c) enter into or suffer any transaction or series of transactions as a result of which Borrower is directly or indirectly controlled by Persons not Affiliates of Borrower as of the date of this Agreement; or (d) breach the provisions of Section 6.02.

(i) Any payment default or other event of default occurs under any bilateral or multi-lateral lease, or credit, or other agreement or instrument to which a Borrower and Lender or any Affiliate of Lender are now or hereafter party; or

(j) Any payment default or other event of default occurs under any other lease, or credit, or other agreement or instrument or any combination thereof to which Borrower or Enterprises is now or hereafter party and under which there is outstanding (on a present value basis for all future rent, in the case of leases), owing or committed an aggregate amount greater than $100,000.00;

(k) Should Enterprises or Dredging default under Section 6.06;

**Section 7.02. <u>Rights and Remedies Upon Event of Default</u>.** Upon the occurrence of an Event of Default or at any time thereafter until such Event of Default is cured to the satisfaction of Lender, Lender may exercise any or all of the following rights and remedies:

(a)    Lender may declare the entire unpaid principal amount of the Notes held by it, all interest accrued and unpaid thereon, and all other amounts payable to it under this Agreement (including, but not limited to, any prepayment amount payable under Section 2.08 hereof), as well as all other Obligations held by it, to be forthwith due and payable, whereupon such Notes, all such accrued interest and all such amounts and such Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Borrower;

(b)    Lender may proceed to protect and enforce this Agreement and the Notes and other evidence of Obligations held by it by suit or suits or proceedings in equity, at law or in bankruptcy, and whether for the specific performance of any covenant or agreement herein contained or in execution or aid of any power herein granted or for the recovery of judgment for the indebtedness hereby owed, or for the enforcement of any other proper legal or equitable remedy available under applicable law; and

(c)    Lender may exercise any other rights and remedies available to it by law or under the other Loan Documents or the Security Documents held by it.

**Section 7.03. <u>Status Quo</u>.** In case Lender shall have proceeded to enforce any right under this Agreement, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to Lender, then, and in every such case, each Borrower and Lender shall be restored to their former positions and rights hereunder.

**ARTICLE VIII**
**<u>Miscellaneous</u>**

**Section 8.01. <u>No Waiver; Cumulative Remedies</u>.** No failure or delay on the part of Lender in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The remedies herein provided are cumulative and not exclusive of any remedies provided by the Loan Documents or available under law.

**Section 8.02. <u>Amendments, Etc.</u>** No amendment, modification, termination or waiver of any provision of this Agreement, the Notes or any other Loan Documents or consent to any departure by any Borrower therefrom shall be effective unless the same shall be in writing and signed by the authorized representatives of Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Any such amendment, modification, termination or waiver shall bind and benefit each Borrower and Lender and their respective successors and assigns, subject, in the case of each Borrower, to the limitations contained in Section 8.07 hereof. No notice to or demand on any Borrower in any case shall entitle a Borrower to any other or further notice or demand in similar or other circumstances.

**Section 8.03.  <u>Reserved</u>.**

**Section 8.04.  <u>Addresses for Notices, Etc</u>.**  Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for hereunder shall be in writing and sent by certified mail (return receipt requested) or nationally recognized overnight courier service delivered to the applicable party at its address indicated below:

<u>If to any Borrower</u>:

Crosby Dredging, LLC
17771 Highway 3235
Galliano, LA 70354-3579
Attention: Farrel Trosclair, Chief Financial Officer

<u>If to Lender</u>:

Regions Commercial Equipment Finance, LLC
1900 5th Avenue North, Suite 2400
Birmingham, AL 35203

Attention: Jimmy Sively

or, as to each party, at such other address or to the attention of such other representative as shall be designated by such party in a written notice to the other party provided in accordance with the terms of this Section. All such notices, requests, demands and other communications shall, when mailed or transmitted (postage or other charges pre-paid), be effective three (3) Business Days after deposited in the mails or one (1) Business Day after deposited with the applicable courier service, addressed as aforesaid.

**Section 8.05.** <u>**Costs, Expenses and Indemnification.**</u> Enterprises agrees to pay all reasonable costs and expenses in connection with the execution and enforcement of the Loan Documents and the Security Documents or any other documents to be delivered hereunder, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for Lender with respect thereto and with respect to advising Lender as to its rights and responsibilities under this Agreement. Each Borrower agrees to pay on demand all losses, reasonable costs and expenses, if any (including reasonable counsel fees and expenses), incurred in connection with the preservation of any rights of Lender under, or the enforcement of, or legal advice in respect of, the rights or responsibilities of Lender under this Agreement with respect to Borrower, that Borrower's Notes held by Lender, the Security Documents in favor of Lender to which the Borrower is a party, and any other documents delivered hereunder including, without limitation, losses, costs and expenses (other than taxes, fees, duties and assessments for which Borrower is not responsible under Section 2.10 hereof) sustained by Lender as a result of any failure by the Borrower to perform or observe its obligations contained herein or in the Borrower's Notes or any other document related thereto. Borrower further agrees to indemnify and hold harmless Lender from and against any and all damages, losses, liabilities, reasonable costs and expenses resulting from, related to or connected with this Agreement, the Borrower's Notes, the Security Documents to which it is a party and any document or instrument delivered in connection herewith or the transactions contemplated thereby.

**Section 8.06.** <u>**Execution in Counterparts.**</u> This Agreement may be executed separately by each Borrower and Lender in any number of counterparts, each of which, when so executed and delivered, shall be deemed to be an original and all of which, taken together, shall constitute but one and the same instrument.

20994.0004RPT8628

**Section 8.07. <u>Binding Effect, Assignment</u>.** This Agreement shall be binding upon and inure to the benefit of each Borrower, Lender and their respective successors and assigns, except that a Borrower may not assign its rights hereunder or thereunder or any interest herein or therein without the prior written consent of Lender. Borrowers shall not be responsible for any costs incurred by Lender in connection with any such assignment by Lender of this Agreement or any interest in and to the Notes.

**Section 8.08. <u>Governing Law</u>.** THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE NOTE SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF LOUISIANA WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF.

**Section 8.09. <u>Judicial Proceedings</u>.** EACH BORROWER AND ENTERPRISES AND THE LENDER AGREE THAT ANY ACTION OR PROCEEDING ARISING UNDER OR RELATED TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE COMMENCED IN ANY FEDERAL OR STATE COURT SITTING IN THE SOUTHERN DISTRICT OF LOUISIANA, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER AND ENTERPRISES HEREBY IRREVOCABLY SUBMIT TO, AND ACCEPT FOR THEMSELVES AND IN RESPECT OF THEIR PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF EACH SUCH COURT AND AGREE NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF SUCH COURT, THAT THE SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER, OR THAT THE AGREEMENT OR THE SUBJECT MATTER THEREOF OR THE TRANSACTION CONTEMPLATED HEREBY OR THEREBY MAY NOT BE ENFORCED IN OR BY SUCH COURT. THE PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH BORROWER AND ENTERPRISES IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT THE ADDRESS FOR IT SPECIFIED IN SECTION 8.04 HEREOF. NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION, SUBJECT IN EACH INSTANCE TO THE PROVISIONS HEREOF WITH RESPECT TO RIGHTS AND REMEDIES.

**Section 8.10. <u>Consent to Loan Participation and Assignments</u>.** Each Borrower and Enterprises agrees and consents to Lender's sale, transfer, assignment or syndication, whether now or later, of one or more interests in the Loans or any one or more of the Notes held by Lender to one or more parties, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any such parties or potential parties, any information or knowledge Lender may have about Borrower or Enterprises or about any other matter relating to

the Loan, and each Borrower and Enterprises hereby waives any rights to privacy it may have with respect to such matters. Borrower and Enterprises additionally waives any and all notices of sale of participation interests or assignment, as well as all notices of any repurchase of such interests. Each Borrower and Enterprises agrees to execute and deliver to Lender or any other party involved any in such sale, transfer or assignment, any and all documents requested by Lender or such other party. The requested documents may include documents to re-define which Notes are cross-collateralized. Following the sale of a Note, unless Borrower has been previously notified, Lender will notify the applicable Borrower within a reasonable time of the closing of such sale.

Notwithstanding the foregoing, no Lender may assign its rights to a foreign holder for which withholding would be required, without the prior written consent of Borrower and Lender, which may include appropriate indemnities with respect to withholding matters.

**Section 8.11.  Severability of Provisions.**  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

**Section 8.12.  Survival of Agreements, Representations and Warranties, Etc.**  All warranties, representations and agreements made by any Borrower herein or in the Notes or by any person in any certificate or other document or instrument required to be delivered in connection with this Agreement shall be considered to have been relied upon by Lender and shall survive the issuance and delivery to Lender of the Notes regardless of any investigation made by Lender on its behalf, and shall terminate only upon the full and final payment and performance by the Borrowers of all the Loans. All statements in any such certificate or other document or instrument shall constitute representations and warranties by Borrower hereunder.

**Section 8.13.  Headings.**  Article and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**Section 8.14.  Jury Trial Waiver.**  EACH BORROWER AND ENTERPRISES AND LENDER IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, THE SECURITY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH BORROWER AND ENTERPRISES ACKNOWLEDGES THAT THE FOREGOING WAIVER IS A MATERIAL INDUCEMENT TO LENDER ENTERING INTO THIS AGREEMENT AND THAT LENDER IS RELYING UPON THE FOREGOING WAIVER IN THEIR FUTURE DEALINGS WITH THE BORROWER AND ENTERPRISES. EACH BORROWER AND ENTERPRISES WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE FOREGOING WAIVER WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Section 8.15**       **USA PATRIOT and Bank Secrecy Act Information.**

(a)All of the written information that Borrower has provided to Lender with respect to Borrower, its Affiliates or otherwise in connection with the Loan contemplated by this Agreement was true, correct and complete at the time it was given.

(b)Borrower shall from time to time furnish any information deemed necessary by the anti-money laundering officer of Lender, Bank of America, NA ("Bank") or any of their Affiliates in his or her sole discretion (other than information that (i) Borrower does not possess, (ii) is confidential, or (iii) Borrower is under an obligation not to disclose) to comply with the USA PATRIOT Act, Federal law requirements that all financial institutions obtain, verify and record information regarding customers pursuant to 31 CFR Part 103.121, such Lender's anti-money laundering program and similar or related responsibilities. All of such information shall be true, correct and complete at the time provided.

(c)Borrower is entering into this Agreement, the Loan Documents, and the transaction contemplated hereby and thereby solely for its own account, risk and beneficial interest, and not for the account or beneficial interest of any other Person.

(d) The Borrower shall represent that on and at all times after the Closing Date neither the Borrower nor any of its respective affiliates (collectively, the **"Company"**) or, to the knowledge of the Company, any director, officer, employee, agent, affiliate or representative of the Company, is an individual or entity (**"Person"**) currently the subject of any sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, **"Sanctions"**), nor is the Company located, organized or resident in a country or territory that is the subject of Sanctions.

The Company shall also represent and covenant that it will not, directly or indirectly, use the proceeds of the transaction, or lend, contribute or otherwise make available such proceeds to, any subsidiary, joint venture partner or other Person (1) to fund any activities of or business with any Person subject of Sanctions or (2) to fund any activities or business in any country or territory, that, at the time of such funding, is the subject of Sanctions. The Company shall also represent and covenant that it will not permit the use or operation of the Vessels (i) in any country or territory that at such time is the subject of Sanctions, or (ii) in any other manner that will result in a violation by any Person, the Lender or any other person participating in the transaction (whether as underwriter, advisor, investor or otherwise) of Sanctions.

**Section 8.16   Borrower is a Legal Entity Customer**. Borrower shall provide Lender with all information, documentation, and certifications that Lender requests regarding beneficial owners of the Borrower pursuant to 31 C.F.R. § 1010.230. Borrower represents and warrants that the most recent of such information, documentation, and certifications submitted to Lender remains true and accurate. Further, Borrower represents and warrants that Borrower will notify Lender promptly—and in no event no later than at any loan renewal—of any changes to any information, documentation, or certifications provided pursuant to the requirements of this paragraph

25

"Legal Entity Customer" has its meaning set forth in 31 C.F.R. § 1010.230(e) and includes a corporation, limited liability company, or other entity that is created by a filing of a public document with a Secretary of State or similar office, a general partnership, and any similar business entity formed under the laws of a foreign jurisdiction that opens an account.

**Section 8.17  <u>Authorization to Obtain and Provide Tax Return Information</u>.** Borrower hereby expressly authorizes Lender, and its successors, assigns, affiliates, agents, service providers, and their respective successors or assigns (each, an "Authorized Party"), to obtain and receive [Borrower's/Guarantor's] tax return information at any time and from time to time, as Lender may, in its sole and absolute discretion, deem necessary or desirable for use in connection with the Loan Agreement or any aspect of any of Lender's business relationships with Borrower whatsoever (a "Permissible Purpose"). Further, Borrower hereby expressly authorizes any Authorized Party to provide tax return information to any other person or entity for any Permissible Purpose at any time and from time to time. By example and not by way of limitation, a Permissible Purpose includes originating, maintaining, managing, monitoring, servicing, selling, collateralizing, obtaining insurance or a guaranty for or on, or securitizing a loan, line of credit, letter of credit reimbursement obligation, or any other obligation whatsoever.

*[signature pages follow]*

20994.0004RPT8628

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**BORROWERS:**
**CROSBY DREDGING, LLC**

By:  Kurt J. Crosby
Title:  Member


**ENTERPRISES:**
**CROSBY ENTERPRISES, L.L.C.**

By:  Kurt J. Crosby
Title:  Member


**LENDER:**

**REGIONS COMMERCIAL EQUIPMENT FINANCE, LLC**


By: _____
Name:
Title:


**LIST OF SCHEDULES TO LOAN AGREEMENT**

Schedule 1-              List of Vessels
Schedule 2.03 -          Form of Note
Schedule 4.07 -          Litigation affecting Borrower
Schedule 5.03-           Insurance Requirements
Form of Compliance Certificate

1

SCHEDULE 1- LIST OF VESSELS

| Vessel Name | Owner | Official Number |
|---|---|---|
| No. 9 | Crosby Dredging, LLC | 171734 |
| Susan Crosby | Crosby Dredging, LLC | 1038405 |
| Crosby Dredger | Crosby Dredging, LLC | 169162 |
| Allison Crosby | Crosby Dredging, LLC | 1032748 |

## SCHEDULE 2.03

Form of Note

## PROMISSORY NOTE

**Principal: [$.00]**                **Date:**                **[], 2021**

FOR VALUE RECEIVED, the undersigned, CROSBY DREDGING, LLC, a Louisiana limited liability company ("Borrower") promises to pay to the order of Regions Commercial Equipment Finance, LLC (the "Payee") at 1900 5th Avenue North, Suite 2400, Birmingham, AL 35203 or at such other place as the Payee or the holder hereof may designate in writing, the principal amount of [_____ AND NO/100 Dollars ($_____.00)], with interest on the unpaid principal amount hereof from and including the date of the advance by Payee of the loan evidenced by this Note until paid in full at a variable simple interest rate equal to the Interest Rate (as hereinafter defined). Interest on this Note shall be computed on the basis of a year of 360 days, consisting of twelve months of thirty days each. "Regions" means Regions Bank.

The interest rate on the Loan evidenced by this Note is subject to change from time to time as provided in this Section. Interest rate changes on the Loan will not occur more often than each Lender Business Day and will be based on changes in Daily Simple SOFR (the "Index"). The interest rate per annum on the Loan will be equal to the Index plus two and eighty-six hundredths of one percentage point (2,86%) (the "Margin"). The interest rate on the Loan may change daily based on changes in the most recent Index reasonably available to Regions. The Index will not be less than percent (0.0%) per annum. Regions will tell Borrower the current Index upon Borrower's request. The Index is not necessarily the lowest rate charged by Regions on its loans. Borrower understands that Regions may make loans based on other rates as well.

"Daily Simple SOFR" is an independent index, which is the rate per annum equal to the secured overnight financing rate published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) (the "Administrator") on the Administrator's website on the fifth (5th) prior SIFMA Business Day, with the conventions for this rate being established by Regions in accordance with the conventions selected or recommended by the Administrator for determining "Daily Simple SOFR" for business loans; provided, that if Regions decides that any such convention is not administratively feasible for Regions, then Regions may establish another convention in its sole discretion.

"Lender Business Day" means any day that is not (i) a Saturday, (ii) a Sunday, or (iii) another day that is a legal holiday under the laws of the State of Alabama and is a day on which Lender is closed.

"SIFMA Business Day" means any day that is not (i) a Saturday, (ii) a Sunday, or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

3

"Term SOFR" means, for the applicable corresponding tenor, the forward-looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

This Note shall be payable in sixty (60) consecutive equal monthly installments of principal each in the amount of $          , together with monthly payments of all accrued but unpaid interest payable on the          (  ) day of each month commencing          , 2021, and one final payment on May    , 2026   (the "Maturity Date") of all unpaid principal and interest in the estimated amount of $          ,  together with all other amounts due hereunder.

All payments hereunder shall be made in lawful money of the United States and in immediately available funds, Automated Clearing House ("ACH") debit or by wire transfer to an account designated by Payee.  If any installment of this Note is not paid within ten (10) days after its due date, the undersigned agrees to pay on demand, in addition to the amount of such installment, an amount equal to five percent (5%) of such installment.  Provided, that if the undersigned has authorized payment of an amount by a binding ACH authorization, a late charge will not be assessed as provided above if there are adequate funds in the account that has been designated for ACH debit and the failure to pay arises solely from Payee's failure to properly complete the ACH debit from the designated account as authorized by the undersigned.

This Note is one of the promissory notes referenced in that certain Loan Agreement by and among Crosby Dredging LLC and the other Borrowers as Borrowers, Crosby Enterprises, LLC as guarantor, and Regions Commercial Equipment Finance, LLC as Lender dated as of May __, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement") and is subject and entitled to all provisions and benefits thereof.  Capitalized terms used, but not expressly defined, herein shall have the meanings as set forth in the Loan Agreement.

Subject to the limitations contained in Section 2.07 of the Loan Agreement, including without limitation the requirements for prepayment, in full, to be made on all outstanding Notes, the undersigned shall have the right to prepay this Note, in whole but not in part, at any time following the second anniversary date of this Note on thirty (30) days prior written notice to the Payee. On the date of such prepayment (the "*Prepayment Date*") the undersigned shall pay the principal amount of this Note being so prepaid (the "*Prepayment Amount*"), together with all accrued interest and fees, including the prepayment premium due under Sections 2.07 and/or 2.08 of the Loan Agreement. The prepayment premium shall be charged and paid only to the extent permitted by Applicable Law.

Upon the maturity of this Note or the acceleration of the maturity of this Note in accordance with the terms of the Agreement, the entire unpaid principal amount on this Note, together with all interest, fees and other amounts payable hereon or in connection herewith, including any prepayment fee due under Section 2.08, shall be immediately due and payable without further notice or demand, with interest on all such amounts at a rate (the "Default Rate")

4

equal to the lesser of (i) the Interest Rate plus 5.0%, or (ii) the maximum rate of interest permitted by Applicable Law, from the date of such maturity or acceleration, as the case may be, until all such amounts have been paid in full. Upon the occurrence of any Event of Default, without further notice or demand and at Payee's discretion, interest on all outstanding sums under this Note shall accrue at the Default Rate, from the date of such Event of Default until all such amounts have been paid in full.

All payments hereunder shall be made in lawful money of the United States and in immediately available funds as provided in the Loan Agreement. If any installment of this Note is not paid within ten (10) days after its due date, the undersigned agrees to pay on demand, in addition to the amount of such installment, the late charge as provided in Section 2.06 of the Loan Agreement.

If any payment on this Note becomes payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to prepayments of principal, interest thereon shall be payable at the applicable rate during such extension.

The undersigned hereby waives diligence, demand, presentment, protest and notice of any kind, and assents to extensions of the time of payment, release, surrender or substitution of security, or forbearance or other indulgence, without notice. The undersigned agrees to pay all amounts under this Note without offset, deduction, claim, counterclaim, defense or recoupment, all of which are hereby waived.

The Payee, the undersigned and any other parties to the Loan Documents intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof the undersigned and the Payee stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract to pay, for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be charged by Applicable Law from time to time in effect. Neither the undersigned nor any present or future guarantors, endorsers, or other Persons hereafter becoming liable for payment of any Obligations shall ever be liable for unearned interest thereon or shall ever be required to pay interest thereon in excess of the maximum amount that may be lawfully charged under Applicable Law from time to time in effect, and the provisions of this paragraph shall control over all other provisions of the Loan Documents which may be in conflict or apparent conflict herewith. The Payee expressly disavows any intention to charge or collect excessive unearned interest or finance charges in the event the maturity of any Obligation is accelerated. If (a) the maturity of any Obligation is accelerated for any reason, (b) any Obligation is prepaid and as a result any amounts held to constitute interest are determined to be in excess of the maximum legal rate allowed under Applicable Law, or (c) the Payee or any other holder of any or all of the Obligations shall otherwise collect amounts which are determined to constitute interest which would otherwise increase the interest on any or all of the Obligations to an amount in excess of that permitted to be charged by Applicable Law then in effect, then all sums determined to constitute interest in excess of such legal limit shall, without penalty, be promptly applied to reduce the then outstanding principal of the related Obligations or, at the Payee's or such holder's option, promptly returned to the undersigned upon such determination. In determining whether or not the interest paid or payable, under any specific circumstance, exceeds the maximum amount permitted under Applicable Law, the Payee and the undersigned

5

(and any other payors thereof) shall to the greatest extent permitted under Applicable Law, (i) characterize any non-principal payment as an expense, fee or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread the total amount of interest through the entire contemplated term of this Note in accordance with the amount outstanding from time to time thereunder and the maximum legal rate of interest from time to time in effect under Applicable Law in order to lawfully charge the maximum amount of interest permitted under Applicable Law.

This Note may not be changed, modified or terminated orally, but only by an agreement in writing signed by the undersigned and the Payee or any holder hereof.

The undersigned shall, upon demand, pay to the Payee all reasonable and documented costs and expenses incurred by the Payee (including the fees and disbursements of counsel and other professionals) in connection with the preparation, execution, delivery and enforcement of this Note and all other Loan Documents on the terms set forth in the Loan Agreement.

This Note shall be binding upon the successors and assigns of the undersigned and inure to the benefit of the Payee and its successors, endorsees and assigns. If any term or provision of this Note shall be held invalid, illegal or unenforceable, the validity of all other terms and provisions hereof shall in no way be affected thereby.

THE UNDERSIGNED AND, BY ITS ACCEPTANCE HEREOF, THE PAYEE, HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES (TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS NOTE AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF LOUISIANA (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

**CROSBY DREDGING, LLC**

By: **Kurt J. Crosby**
Title: **Member**

7

**SCHEDULE 5.03**

**REQUIRED INSURANCES**

(a)  The Borrower shall, without cost to the Lender, maintain insurance on the Vessel(s) as specified below and in Article 8 of each Ship Mortgage, and, in addition, keep the Vessel(s) insured against such further risks as may be commercially reasonable or reasonably specified by the Lender from time to time.  The Borrower shall maintain all such insurance in an amount in United States dollars which shall not be less than the unpaid balance of the Loan on the Vessel from time to time.  In the case of marine protection and indemnity insurance required herein, including pollution risks coverage, the limits of such policies shall not be less than Two Hundred Million Dollars ($200,000,000.00) for all risks other than pollution coverage, and Two Hundred Million Dollars ($200,000,000.00) for all pollution coverage risks and liabilities.

(1)   (a) (i) Hull and machinery insurance (including, without limitation, navigation and port risk for all locations where the Vessel may be located from time to time); (ii) Protection and indemnity insurance under an SP-38 form of endorsement or similar or greater coverage; and (iii) Pollution risks insurance, including Water Quality Insurance Syndicate coverage.  Such policies of insurance shall be under the most current forms (determined at the time of issuance of the policies in question) of policies approved by the Lender insuring against the usual risks covered by such forms (including, at the option of the Borrower, such amounts of increased value as are permitted by said hull insurance policy).

(b)  While the Vessel is laid up, at the option of the Borrower and in lieu of hull and machinery and protection and indemnity insurance, port risk insurance under the most current forms (determined at the time of issuance of the policies in question) of policies approved by the Lender insuring the Vessel against hull and machinery and protection and indemnity risks.

(c)  In addition, the Lender's interest in the Vessel shall be noted by any Protection and Indemnity Club (where applicable) in which the Vessel is enrolled.

(d)  The Borrower shall maintain breach of warranty or mortgagee's interest coverage for the Vessel in a form acceptable to Lender and in an amount not less than the unpaid balance of the outstanding Loan on the Vessel, as determined by Lender from time to time.

(2)    Workers' Compensation and Employer's Liability Insurance, including statutory workers' compensation in compliance with the laws of the states in which employees of the Borrower conduct operations and the United States Longshore and Harbor Workers' Compensation Act, as extended by the Outer Continental Shelf Land Act. Such insurance shall further include voluntary compensation coverage, occupational disease coverage, maritime coverage "B" for employers' liability and amendment of coverage "B" to include claims under the Jones Act, claims under 33 U.S.C.A. §905(b)

and claims for transportation, wages, maintenance and cure to the extent not covered under the protection and indemnity policy required above.

(3)     Borrower shall further on behalf and for the benefit of itself and Lender maintain a Certificate of Financial Responsibility (Oil Pollution) issued by the United States pursuant to the Federal Water Pollution Control Act or other applicable law to the extent that same may be required by law or regulation and such other similar certificates as may be required in the course of the Vessel's operation pursuant to the International Convention on Civil Liability for Oil Pollution Damage of 1969, or other applicable government requirement.

[ END OF SCHEDULE 5.03 ]

SCHEDULE 5.15

<u>Litigation</u>

**None.** There are no actions, suits or proceedings pending or threatened against or affecting any Borrower or Enterprises, or any Affiliate of Borrower or Enterprises or the properties of any Borrower or Enterprises or such Affiliate before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if adversely determined, would have a Material Adverse Effect on the financial condition, properties or operations of a Borrower or Enterprises and Borrower's or Enterprises ability to perform hereunder and under the Loan Documents or the Security Documents.

[ END OF SCHEDULE 5.15]

Compliance Certificate
Re:  Loan Agreement dated May 28, 2021 ("Loan Agreement")

Date: _____

[CROSBY ENTERPRISES, LLC]
[CROSBY DREDGING, LLC]
("Company")

Quarter: _____

Section 6.06  Fixed Charge Coverage Ratio:
For each applicable period, a ratio whose numerator is EBITDA for the period and whose denominator is scheduled payments of principal and interest during such period, exclusive of balloon payments of principal

EBITDA: $_____

Principal and interest
During period, exclusive
Of balloon payments of principal:  $_____

Required Fixed Charge Coverage Ratio:  > 1.0 to 1.0

Actual Fixed Charge Coverage Ratio: _____

Company further verifies that there are no Defaults or Events of Default under the Loan Agreement.  [if applicable: other than (list Defaults and curative steps being taken with respect to same)]

[CROSBY ENTERPRISES, LLC]
[CROSBY DREDGING, LLC]

_____
By:  Farrel Trosclair, CFO

11